# United States Court of Appeals
## For the First Circuit

---

No. 12-1137

LUCIANO MANGANELLA,

Plaintiff, Appellant,

v.

EVANSTON INSURANCE COMPANY,

Defendant, Third-Party Plaintiff, Appellee,

v.

JASMINE COMPANY, INC.,

Third-Party Defendant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

---

Before

Lynch, Chief Judge,
Selya and Stahl, Circuit Judges.

---

Bruce S. Barnett, with whom Daniel E. Rosenfeld and DLA Piper LLP were on brief, for appellant.
Harvey Nosowitz, with whom Anderson & Krieger LLP was on brief, for appellee.

---

November 27, 2012

---

**STAHL, <u>Circuit Judge</u>.** This insurance coverage dispute arises from charges of sexual harassment brought by a one-time employee against appellant Luciano Manganella, the former president of Jasmine Company, Inc. Manganella sought a defense to and indemnity for the harassment claims from appellee Evanston Insurance Co., Jasmine's liability insurance provider. The district court ruled that Manganella was not entitled to coverage from Evanston because, under the doctrine of issue preclusion, a prior arbitration between Manganella and the purchaser of his business conclusively established that Manganella's conduct fell within an exclusion to Evanston's insurance policy. After careful consideration, we affirm.

## I.  Facts & Background

Before the events giving rise to this action, Manganella was the president and sole shareholder of Jasmine, a clothing retailer that he founded in the 1970s. Donna Burgess, whose sexual harassment allegations against Manganella form the underlying claims here, was Jasmine's human resources manager from 1997 to 2006.

In 1998, a former Jasmine employee, Sonia Bawa, filed claims of sexual harassment against Jasmine based on Manganella's conduct. Soon thereafter, Jasmine purchased from Evanston the Employment Practices Liability Insurance Policy at issue here (the "Policy"). Jasmine's coverage from Evanston under the Policy

-2-

consisted of a series of annually renewed one-year installments. The Policy covers any "claim" that seeks "relief for a Wrongful Employment Practice" and is made and reported to Evanston during the policy period or an extended reporting period. A Wrongful Employment Practice includes, as relevant here, "conduct of an Insured with respect to . . . [an] employee that allegedly culminated in . . . violation of any state, federal or local civil rights or anti-discrimination law and/or fair employment practices law." For a resulting claim to be covered, a Wrongful Employment Practice must have "happened" in its "entirety" during the policy period or after the retroactive date (here, April 28, 1999). Importantly, one of the Policy's exclusions (the "Disregard Exclusion") bars coverage for claims based on "conduct . . . committed with wanton, willful, reckless or intentional disregard of any law or laws that is or are the foundation for the Claim."

In July 2005, Manganella sold Jasmine to Lerner New York, Inc. for approximately $30 million. Manganella and Lerner executed a stock purchase agreement ("SPA") to effectuate the sale and an employment agreement under which Manganella would remain Jasmine's president for three years. Under the SPA, $7 million of the purchase price was placed in escrow, "as security . . . in the event of a Major Employment Breach" by Manganella. A "Major Employment Breach" is a breach of the employment agreement that arises from, among other things, a refusal to comply with any

"significant" policy of Lerner's. A few months after the sale was completed, Jasmine cancelled the final installment of the Policy, but purchased an extended reporting period, which allowed for coverage of claims made and reported during the thirty-six months following the effective date of the cancellation.

In May 2006, further allegations of sexual harassment by Manganella prompted Jasmine to hire an outside investigator, Stier Anderson LLC, which interviewed several employees, including Burgess; she recounted inappropriate comments that Manganella had made in the past. On June 22, 2006, as a result of conduct revealed by the investigation, Manganella was fired. In a letter to Manganella, Lerner accused him of committing multiple Major Employment Breaches by sexually harassing four female employees and downloading sexually explicit images on company computers, all in violation of Lerner's Code of Conduct. Lerner demanded that Manganella agree to release the escrowed $7 million.

One week later, Lerner invoked the SPA's arbitration clause, contending that Manganella had forfeited the escrowed funds by committing a Major Employment Breach. The arbitration panel held ten days of hearings and received extensive written and oral argumentation. The panel issued its ruling in April 2007, finding that Manganella had "sexually propositioned several women employees and inappropriately touched and propositioned one of these employees," in willful violation of Lerner's corporate Code of

-4-

Conduct. The panel explained: "We find, despite his protestations to the contrary, that [Manganella] was well acquainted with the Company's policy on sexual harassment and other acts of inappropriate conduct. We find thus that he did not comply with the policy and that his refusal was willful."

The panel also found, however, that Lerner had failed to give Manganella notice of and an opportunity to remedy these violations, as required by the SPA. Consequently, the panel awarded Manganella the escrowed funds, along with interest and attorneys' fees. The arbitration award was confirmed by a federal court in August 2007. Manganella v. Lerner N.Y., Inc., 07-cv-06250-RJH (S.D.N.Y. Aug. 7, 2007) (order confirming arbitration award).

On March 19, 2007 (roughly a month before the arbitration ended), Burgess filed a charge of discrimination against Manganella, Lerner, and Jasmine with the Massachusetts Commission Against Discrimination ("MCAD"). The MCAD charge alleged that, "[t]hroughout her employment with Jasmine[], Manganella subjected Ms. Burgess to nearly constant physical and verbal sexual harassment," including "inappropriate comments about Ms. Burgess'[s] body, inappropriate touching," and, eventually, coerced sexual activity on five separate occasions. Manganella also "made sexual comments about other women in Ms. Burgess'[s] presence," and threatened Burgess (and others) with physical violence.

-5-

Ten days after Burgess filed the MCAD charge, Manganella notified Evanston of her claims and requested coverage under the Policy. Less than two weeks later, Evanston replied, denying coverage for Burgess's claims on the ground that it was "apparent" that the harassment alleged in her MCAD charge "did not happen in its entirety subsequent to the [April 28, 1999] Retroactive Date," as required for coverage. Evanston's letter also adverted, without elaboration, to the Disregard Exclusion.

Manganella filed this action against Evanston in July 2009, seeking a ruling that Evanston was required under the Policy to defend and indemnify him against Burgess's MCAD charge. He also alleged breaches of contract, breach of the duty of good faith and fair dealing, and violations of Mass. Gen. Laws chs. 93A, § 9 and 176D, all stemming from Evanston's refusal to defend and indemnify him. After discovery, Manganella and Evanston cross-moved for summary judgment. The district court held that Evanston should have at least investigated the MCAD charge before denying coverage, given that it was aware of certain facts suggesting that Manganella's unlawful conduct may not have begun prior to the Policy's retroactive date. Manganella v. Evanston Ins. Co., 746 F. Supp. 2d 338, 346 (D. Mass. 2010). The court also concluded, however, that the conduct described in Burgess's MCAD charge fell within the Policy's Disregard Exclusion. The court found that the arbitration panel's determination that Manganella had harassed his

employees (including Burgess) in willful violation of Lerner's Code of Conduct also established that, for purposes of the Disregard Exclusion, Manganella acted "with wanton, willful, reckless or intentional disregard of" the Massachusetts sexual harassment law underlying Burgess's MCAD charge. Id. at 347-48. The district court thus held that the doctrine of issue preclusion barred Manganella from relitigating that question, and granted summary judgment for Evanston. Id. at 349.[1] Manganella now appeals that ruling.

## II. Analysis

We review a grant of summary judgment de novo. Baker v. St. Paul Travelers Ins. Co., 670 F.3d 119, 125 (1st Cir. 2012). Likewise, "[w]e review de novo the district court's application of the doctrine of issue preclusion because '[t]he applicability vel non of preclusion principles is a question of law.'" Keystone Shipping Co. v. New Eng. Power Co., 109 F.3d 46, 50 (1st Cir. 1997)

---

[1] In a separate summary judgment opinion, the district court resolved third-party claims that Evanston brought against Jasmine to establish that it did not owe Jasmine coverage for Burgess's claims. Manganella v. Evanston Ins. Co., No. 09-cv-11264-RGS, 2011 WL 5118898 (D. Mass. Oct. 28, 2011). The court reiterated its holding that Evanston had breached its duty to investigate the MCAD charge before denying coverage, and went on to determine that Evanston had to indemnify Jasmine for Burgess's claims because the conduct she alleged happened entirely after the Policy's retroactive date. See id. at *5-7. That ruling is the subject of a separate appeal. See Evanston Ins. Co. v. Jasmine Co., No. 12-1139 (1st Cir. argued Nov. 6, 2012).

-7-

(second alteration in original) (quoting <u>Monarch Life Ins. Co.</u> v. <u>Ropes & Gray</u>, 65 F.3d 973, 978 (1st Cir. 1995)).

The crux of this appeal is whether the district court properly applied the doctrine of issue preclusion to bar Manganella from litigating whether the Policy's Disregard Exclusion applies to the conduct alleged in Burgess's MCAD charge. As described above, the district court held that the arbitration between Lerner and Manganella had decided, in the affirmative, the crucial question of whether Manganella's acts, as alleged by Burgess, were committed with wanton, willful, reckless, or intentional disregard for the Massachusetts sexual harassment law that formed the basis for her claims against him. 746 F. Supp. 2d at 348. Although the parties dispute whether Massachusetts or federal preclusion principles govern this question, we need not resolve that quarrel because we see no material difference in how the two standards would apply here. <u>See</u> <u>Keystone Shipping</u>, 109 F.3d at 51 (noting that "our cases apply the same traditional preclusion principles that would control in a Massachusetts court").

Issue preclusion (also called collateral estoppel) "prevents a party from relitigating issues that have been previously adjudicated." <u>Rodríguez-García</u> v. <u>Miranda-Marín</u>, 610 F.3d 756, 770 (1st Cir. 2010). The doctrine applies to issues of fact as well as those of law, <u>Allen</u> v. <u>McCurry</u>, 449 U.S. 90, 94 (1980), and can apply where the subsequent proceeding involves a

-8-

cause of action different from the first, see Comm'r v. Sunnen, 333 U.S. 591, 601 (1948). Under modern preclusion doctrine, "the central question is 'whether a party has had a full and fair opportunity for judicial resolution of the same issue.'" Rodríguez-García, 610 F.3d at 771 (quoting Fiumara v. Fireman's Fund Ins. Cos., 746 F.2d 87, 92 (1st Cir. 1984)).

Generally, final arbitral awards are afforded the same preclusive effects as are prior court judgments. See FleetBoston Fin. Corp. v. Alt, 638 F.3d 70, 79 (1st Cir. 2011) (citing Wolf v. Gruntal & Co., 45 F.3d 524, 528 (1st Cir. 1995)). As we have noted, however, "there may be particular difficulties" in applying preclusion principles to an arbitral award, especially where the reasoning behind the award is unexplained. Id. at 80. Thus, "it has been suggested that courts have discretion as to whether issue preclusion is appropriate" in the arbitration context. Id. (citing 18B Charles Alan Wright et al., Federal Practice & Procedure § 4475.1, at 518 (2d ed. 2002)). Here, though, "[w]e need not consider that suggestion, as we find it clear that the outcome we reach is consistent with the traditional requirements." Id.

Under those traditional requirements, issue preclusion may be applied to bar relitigation of an issue decided in an earlier action where: (1) the issues raised in the two actions are the same; (2) the issue was actually litigated in the earlier action; (3) the issue was determined by a valid and binding final

judgment; and (4) the determination of the issue was necessary to that judgment.  Id.; accord Mercado-Salinas v. Bart Enters. Int'l, Ltd., 671 F.3d 12, 21-22 (1st Cir. 2011).  Here, Manganella argues that two of these predicates are missing: identity of the issues and necessity to the judgment.  We begin with identity of the issues.

For issue preclusion to apply here, the arbitrators must have decided an issue "the same as the one presented" in this case. Smith v. Bayer Corp., 131 S. Ct. 2368, 2376 (2011).  The identity of the issues need not be absolute; rather, it is enough that the issues are in substance identical.  See Montana v. United States, 440 U.S. 147, 155 (1979) (asking "whether the issues presented [in the two actions] are in substance the same").  Further, the issue need not have been the ultimate issue decided by the arbitration; issue preclusion can extend to necessary intermediate findings, Rodríguez-García, 610 F.3d at 771, even where those findings are not explicit, Grella v. Salem Five Cent Sav. Bank, 42 F.3d 26, 30-31 (1st Cir. 1994).  Nevertheless, the arbitrators must have effectively resolved the issue presented here: whether Manganella's conduct, as described in the MCAD charge, was committed "with wanton, willful, reckless or intentional disregard of" the Massachusetts sexual harassment law underlying the charge.

Manganella argues that the arbitrators were simply never called upon to decide whether he acted in disregard of state law.

-10-

He claims that Lerner's Code of Conduct is broader and stricter than state sexual harassment law; the Code, he says, reaches not only sexual harassment serious enough to violate the law, but also less serious harassment, as well as behavior that would embarrass the company or constitute a failure of leadership.  Thus, Manganella argues, the arbitrators did not, in the process of deciding whether he violated the Code, decide anything about the relationship between his conduct and state law.

We think that Manganella overstates the differences between the Code of Conduct and the state law referenced in the Disregard Exclusion.  The relevant portion of the Code provides:

> We are committed to maintaining a workplace entirely free from illegal discrimination or harassment. . . .
>
> The term "harassment" may include unwelcome slurs and other offensive remarks, jokes and other verbal, graphic or unwelcome physical contact.  Harassment may also include unwelcome sexual advances, requests for sexual favors or unwelcome or offensive touching and other verbal, graphic or physical conduct of a sexual nature . . . .

The applicable state law similarly provides that sexual harassment means:

> sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when (a) submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for employment decisions; [or] (b) such advances, requests or conduct have the purpose or effect of unreasonably

-11-

> interfering with an individual's work
> performance by creating an intimidating,
> hostile, humiliating or sexually offensive
> work environment.

Mass. Gen. Laws ch. 151B, § 1(18).  Thus, both the state law and the Code reach "sexual advances," "requests for sexual favors," and other "verbal" or "physical" "conduct of a sexual nature."

To be sure, the law does impose a severity requirement absent from the Code; the behavior described above is unlawful only if it involves a quid pro quo or "creat[es] an intimidating, hostile, humiliating or sexually offensive work environment."  But this requirement does not, as Manganella suggests, mean that a single incident cannot constitute unlawful sexual harassment.  In fact, the Supreme Judicial Court has declined to require sexual harassment claims to be based on any particular number of incidents.  See Gnerre v. Mass. Comm'n Against Discrim., 524 N.E.2d 84, 88-89 (Mass. 1988) (citing Coll.-Town, Div. of Interco, Inc. v. Mass. Comm'n Against Discrim., 508 N.E.2d 587, 591 (Mass. 1987)); see also Maltese v. Thacker, No. CA963864, 2000 WL 1180285, at *2 (Mass. Super. Ct. May 3, 2000) ("A single incident can, depending on the nature and severity of the conduct, constitute sexual harassment.").  Thus, the fact that the arbitrators did not expressly find that Manganella had propositioned any particular employee more than once does not mean that his conduct could not have run afoul of the law.

-12-

None of this is to say that we see no distinction between the standard imposed by the Code and that created by the law. Rather, the point is that the two standards are similar enough that we are unable to discern a meaningful difference, on the facts of this case, between acting in willful violation of the former (which the arbitrators found Manganella to have done) and acting with wanton disregard of the latter (which triggers the Disregard Exclusion). Because of this similarity, sexually harassing conduct committed in willful violation of the Code, by a person familiar with the law, would, on these facts, show a wanton or reckless disregard for whether that conduct was lawful.

Manganella's fall-back position is that the two issues are nevertheless not the same because the arbitrators did not make any findings specific to Burgess herself. Thus, he contends, the arbitration could not have decided whether the conduct <u>alleged in Burgess's MCAD charge</u> was committed in disregard of the law. This argument, however, is impossible to square with Manganella's admission below that "Burgess is one of the Jasmine employees who the Arbitration panel found Mr. Manganella had sexually harassed." In light of that concession, the only open question is whether Burgess was one of the "several" employees Manganella was found to have "sexually propositioned" or was instead the one employee he "inappropriately touched" <u>and</u> "propositioned." But for present purposes, this distinction is immaterial; for the reasons given

above, we do not see how Manganella could have undertaken any of this conduct without a wanton or reckless disregard for its legality. Thus, the lack of factual findings expressly tied to Burgess herself does not place the present issue beyond the scope of the arbitrators' decision.

One final point bolsters our conclusion that the arbitrators effectively decided the issue presented here: proof of a willful violation of the Code and proof of conduct committed in disregard of the law would be extremely similar. See 18 Wright et al., supra, § 4417, at 413 n.2 (noting that, in defining the issues precluded by a prior action, courts consider, among other factors, whether there is a substantial overlap between the evidence or argument advanced in the two proceedings); accord Restatement (Second) of Judgments § 27 cmt. c (1982). Apart from the question of findings specific to Burgess, discussed above, the only obvious difference in proof is that the evidence in the arbitration was geared toward showing Manganella's familiarity with the Code, whereas the evidence in a proceeding based on the Disregard Exclusion would be aimed at showing his familiarity with state law. But we believe that the arbitration sufficiently established this point; as the arbitrators found, Manganella was "quite familiar with the subject of sexual harassment," having in 1998 updated Jasmine's company policy to reflect the same Massachusetts sexual harassment law that undergirded Burgess's claims against him.

Thus, we believe that a subsequent proceeding to litigate the applicability of the Disregard Exclusion would involve substantially the same discovery, testimony, and argument as did the arbitration.

Consequently, we turn to the other element of issue preclusion that Manganella contends is missing here: necessity to the judgment. Manganella asserts that the arbitrators' finding that he engaged in sexual harassment in willful violation of Lerner's Code of Conduct was not essential to their ruling. Because the arbitrators' decision ultimately turned on whether Lerner had given Manganella the contractually required notice of and opportunity to remedy his misdeeds, Manganella argues that the arbitrators could have reached the same result by simply assuming the validity of the harassment allegations and not making explicit findings thereon. Based on what was actually decided by the arbitrators, we disagree.

To begin with, although Manganella argues here that the arbitrators could have just assumed the truth of the harassment allegations, he did not ask them to do so. Rather, he vigorously litigated both the truth of those allegations and the question of whether he knew that his behavior was prohibited. Thus, there is no concern here that the panel's resolution of this issue was based on something less than a full adversarial presentation, which could call into question whether the issue was "actually litigated" for

preclusion purposes.  See FleetBoston Fin. Corp., 638 F.3d at 81 (finding preclusion appropriate where parties not only had a "full opportunity" to litigate before arbitrators, but also "fully took advantage of that opportunity"); cf. Kane v. Town of Harpswell (In re Kane), 254 F.3d 325, 329 (1st Cir. 2001) (giving "situations where a matter is stipulated [or] admitted without controversy" as examples in which actual litigation is absent (citing Restatement (Second) of Judgments § 27 cmt. e (1982))).

In any event, Manganella's argument that the arbitrators' findings as to his sexually harassing conduct were not necessary to the arbitral judgment is based on a misapprehension of the necessity-to-the-judgment requirement.  We do not ask whether the resolution of an issue was necessary to reach the same outcome; rather, the inquiry is whether the issue was necessary to the decision actually rendered.  See 18 Wright et al., supra, § 4421, at 548-49 (suggesting that courts should resist the urge "to speculate that a prior decision could have been rested on narrower grounds than those actually chosen, so that resolution of the broader issues was not necessary to the decision"); cf. Rodríguez-García, 610 F.3d at 771.  Here, the arbitrators' determination that Manganella sexually harassed his employees in willful violation of the Code was necessary to the actual decision reached because the panel had to decide whether Lerner's undisputed failure to comply with the SPA's notice-and-remedy requirement was excusable.  New

-16-

York law, which governed the arbitration, sometimes allows non-breaching parties to eschew such contractually mandated measures, including where they would prove futile. See Wolff & Munier, Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003, 1009 (2d Cir. 1991); Sea Tow Servs. Int'l, Inc. v. Pontin, 607 F. Supp. 2d 378, 389 (E.D.N.Y. 2009). To assess whether this doctrine excused Lerner's omission, the arbitrators weighed a raft of factors, including the specifics and severity of Manganella's conduct. Ultimately, they determined that, although Manganella's behavior was egregious and willfully violated the Code, notice was still feasible under the circumstances; in particular, they concluded that Manganella could have been given the requisite notice after being placed on administrative leave. The panel's factual findings as to Manganella's conduct were part and parcel of its resolution of this issue, and were thus "necessary intermediate findings," to which we give preclusive effect. See Rodríguez-García, 610 F.3d at 771 (citation and emphasis omitted).[2]

In sum, the arbitration presented Manganella with the "full and fair opportunity" for adjudication of the issue at hand that is the centerpiece of modern issue preclusion doctrine. See

---

[2]     We do not see the panel's finding that Lerner was not excused from complying with the SPA's notice-and-remedy requirement as reflecting a conclusion that Manganella's malfeasance was somehow less than serious; rather, the panel explained that its decision that notice was still appropriate reflected the philosophy that parties should attempt "to find resolutions to even the most egregious of misconduct."

id. (quoting Fiumara, 746 F.2d at 92). The extent of his harassing conduct and his knowledge that it was prohibited were vigorously litigated and were essential to the panel's judgment. Allowing Manganella to contest these questions now would contravene the twin goals of issue preclusion: protecting litigants from the burden of relitigating settled issues and promoting judicial economy by preventing needless litigation. See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 (1979). Accordingly, the district court was correct to bar Manganella from disputing the applicability of the Disregard Exclusion.

That conclusion, in turn, forecloses the other contentions that Manganella presses on appeal. Manganella avers that Evanston must reimburse him for the cost of the arbitration with Lerner because it was "reasonably related to the defense of" Burgess's harassment claims. But, because the Disregard Exclusion applies to Burgess's claims against Manganella, her claims were not covered and Evanston had no duty to defend Manganella against them, let alone to defend him in a proceeding "reasonably related" thereto.

Likewise, the applicability of the Disregard Exclusion is fatal to Manganella's state law claims, which allege breaches of contract and violations of Mass. Gen. Laws chs. 93A and 176D and the duty of good faith and fair dealing. Because Evanston's denial of coverage was justified by the Disregard Exclusion, these claims

-18-

cannot proceed under the theory that the denial of coverage was wrongful. See Timpson v. Transamerica Ins. Co., 669 N.E.2d 1092, 1098 (Mass. App. Ct. 1996). The only other basis that Manganella offers for these claims is Evanston's initial failure to investigate Burgess's MCAD charge before denying coverage. But, as Evanston points out (and as Manganella does not address), even if that omission was improper, it cannot have harmed Manganella because any investigation would have promptly revealed the arbitration award, which, as we have explained, establishes the applicability of the Disregard Exclusion. See Van Dyke v. St. Paul Fire & Marine Ins. Co., 448 N.E.2d 357, 362 (Mass. 1983) (rejecting chapter 93A claims because, even if insurer "had conducted a proper investigation," it would have been justified in refusing settlement, so "any omission" by the insurer "did not cause any injury to or adversely affect the plaintiffs"). Because Manganella offers no other way for these claims to survive in the absence of his coverage claim, we need not address them further.

### III. Conclusion

For the foregoing reasons, we affirm.